678 A.2d 209

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. HARRY KITTRELL, DEFENDANT–APPELLANT.

Argued February 13, 1996—Decided July 3, 1996.

*Jay L. Wilensky*, Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner*, Public Defender, attorney).

*Catherine A. Foddai*, Deputy Attorney General, argued the cause for respondent (*Deborah T. Poritz*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the application of *N.J.S.A.* 2C:35–4, entitled, "Maintaining or operating a controlled dangerous substance production facility" and requires the Court to determine whether cutting and repackaging crack cocaine inside the apartment of another is sufficient to sustain a conviction under that statute.

I

For over a year, and usually at night, Detective Robert Wright of the Hackensack Police Department, Narcotics Division, observed defendant, Harry Kittrell, standing outside an apartment complex located at 69 Railroad Avenue in Hackensack, notwithstanding the fact that his last known address was on Pine Street (located at the opposite side of the city). Detective Wright also frequently observed defendant in the hallways of the building on 69 Railroad Avenue or entering apartment A–1 on the first floor. Albertina Brown lived in Apt. A–1.

The apartment complex located at 69 Railroad Avenue is a three story walk-up with six apartments on each floor. The only entrance to the building is located approximately 15–20 feet from the street and is well illuminated by street lights. The area surrounding and including 69 Railroad Avenue is located in a high drug distribution area and the Hackensack Narcotics Division has made hundreds of drug arrests there. Based upon confidential information from informants and his own observations of defendant, Detective Wright sought and obtained a search warrant for Apt. A–1 on September 13, 1991.

At trial, Detective Wright testified that at approximately 11:30 p.m. on September 13, 1991, he, along with at least five other officers, began surveillance of 69 Railroad Avenue. Detective Wright was stationed with Detective Sergeant Albert Gutierrez in a van parked about fifty feet from the entrance of 69 Railroad Avenue. The officers were equipped with binoculars to conduct the surveillance.

Near midnight, a brown car driven by a female, who was later identified as Makeba Drayton, and with defendant in the passenger seat, arrived and parked in front of the building. The officers in the van stated that defendant exited the car and entered the building, emerging a few minutes later. The officers testified that defendant placed an object on a ledge under an air conditioner in a window to Albertina Brown's apartment before returning to the car.

Officer Gutierrez testified that an unidentified male approached the passenger side of Drayton's car approximately ten minutes after defendant exited the building and re-entered the car. After a brief conversation between defendant and the male, defendant exited the car, went to the air conditioner, removed an object from underneath it, walked back to the other man, and exchanged whatever he had removed from under the air conditioner · for "what appeared to be money." Defendant then rejoined Drayton in the car.

Officer Wright testified that he observed a similar transaction around 12:20 a.m. The detective testified that at about 12:20 a.m. on what was then September 14, 1991, a second unknown man, wearing a yellow shirt, walked up to the passenger side of Drayton's car and spoke to defendant. Again, after a brief conversation, defendant exited the car, walked to the air conditioner and removed something. After observing this, Detective Wright radioed to other police units for assistance in executing the warrant.

Two officers and a detective responded to Wright's call. One officer detained defendant, and Detective Wright removed four small blue bags of what appeared to be cocaine from underneath the air conditioner. The officers arrested defendant after a cursory search uncovered $15 and a pager.

Following defendant's arrest, the police conducted a search of Albertina Brown's apartment. The police discovered Albertina Brown, Robert Clark (defendant's cousin) and a small child inside apartment A–1. These individuals were detained in the living room

while the officers conducted a search of the apartment. Officer Kevin O'Boyle conducted a search of Brown's bathroom and found a brown eyeglass holder on the top of the medicine cabinet. He discovered a number of small plastic bags containing what appeared to be cocaine inside the holder. No other contraband was found in the apartment.

A laboratory certificate described the substances seized from the eyeglass holder as: (1) 22 blue topped vials, containing a total of 1.53 grams of cocaine; (2) 16 yellow plastic bags, totalling 1.2 grams of cocaine; (3) 50 blue plastic bags totalling 1.08 grams of cocaine; and (4) a bag of marijuana certified to contain .53 grams. The four blue bags retrieved from under the air conditioner were certified to contain a total of .10 grams of cocaine. The total amount of cocaine retrieved from the apartment and from underneath the air conditioner was 3.83 grams.

Albertina Brown was arrested and brought to police headquarters. Robert Clark was released. At the police headquarters, Brown gave the following statement to the police:

> I was in my apartment and you guys came in. You guys found some crack in my bathroom. The crack was not mine. It was Harry's. He just left the apartment. I'm not going to take the weight this time for Harry. He was in my apartment tonight and was in my bathroom. I let him use my apartment to cut up his crack but none of the crack you found is mine. I used to sell crack for Harry but I got caught and am doing probation. I am not going to take the weight for Harry again. He makes all the money and I go to jail. The crack you found is Harry's. He buys it in New York and cuts it up in my apartment. I do not sell crack anymore. He likes to keep his stash in my apartment. He keeps a small supply on him, or in my mailbox, or under the air conditioner. If he gets caught he would only be caught with possession instead of distribution. He has people selling for him all around town. He likes to threaten everyone in the projects. But I'm not afraid. I'm not going to take his weight. Everyone that sells for Harry is afraid to testify against him because of his size and he has guns. I ain't afraid to testify. No way am I going to take his weight again.

On December 5, 1991, the Grand Jury indicted defendant, Harry Kittrell, and co-defendant, Albertina Brown. The indictment charged defendant with maintaining or operating a controlled dangerous substance (CDS) facility, contrary to *N.J.S.A.* 2C:35–4 (count one); possession of a CDS, cocaine, contrary to

*N.J.S.A.* 2C:35–10a(1) (counts three and five); and possession of cocaine with intent to distribute, contrary to *N.J.S.A.* 2C:35–5a(1) and 5b(3) (counts two and four).

Co-defendant Brown pled guilty to reduced charges and was a witness for the state. However, when Brown was called to testify, she repudiated the statement she had given at police headquarters and contended that Wright, after reading her rights to her, had her sign a blank piece of paper. She understood that if she signed the paper she could leave the headquarters. She denied telling Wright that defendant left crack in her apartment on the night of the arrest. Brown did testify, however, that defendant was in her apartment earlier in the day, but did not remember whether he had used the bathroom where the narcotics were found. Brown also denied telling Wright that defendant had placed crack under her air conditioner, and in fact denied having an air conditioner.

Brown further denied that either she or defendant used the apartment to distribute drugs. Brown did testify, however, that during the day of the search defendant came into her apartment with a piece of crack cocaine "no bigger than [your thumb]" and "[H]e didn't package into small bags, just cut it up and left." According to Brown, after defendant cut the crack cocaine on that occasion, "he left the crumbs [that] were on the plate" for Brown "because [she] smokes." Brown testified that on that occasion, but no other, she had allowed defendant to use her apartment in exchange for crack, "because [she] didn't have no money, and . . . wanted a hit." She testified that defendant put all of the pieces into one bag. Brown denied that defendant had repackaged what he had cut up into smaller bags. She further denied that the drugs that were seized in her apartment were cut in the apartment. The trial court allowed the State at trial to introduce Brown's statement at the police station as a prior inconsistent statement. The defendant did not testify at trial, but Makeda Dayton, the driver of the car, testified that defendant never went in the apartment building that night.

The State's expert at trial, Bergen County Investigator Kerriann Gianotti, testified that the vials found in Apt. A–1 probably sold for $5 to $15 each, while the bags sold from between $3 and $15 per bag. Gianotti further testified that the cocaine that was seized was "definitely" possessed with intent to distribute, while she believed the marijuana was for personal use. She added that crack cocaine is most frequently, but not always, produced and repackaged in the same location. Gianotti explained that crack is easy to manufacture, with "just a stove" needed to make it. Gianotti testified that "anywhere you have a heat source, a pot, water and baking soda, you can make crack."

The jury returned a verdict of guilty on all counts. After granting the State's application for an extended term pursuant to *N.J.S.A.* 2C:43–6f, the court sentenced defendant on count one to 60 years imprisonment with a parole disqualifier of 30 years, along with a Drug Enforcement and Demand Reduction (DEDR) penalty of $30, and a laboratory fee of $50. On each of the remaining counts, the court imposed a concurrent sentence of 8 years with three years of parole ineligibility, along with a separate DEDR penalty of $1000, VCCB penalty of $30, and laboratory fee of $50. The sentence was ordered to run concurrently with a ten year extended term sentence for distribution of cocaine that defendant was already serving. On May 25, 1993, defendant, *pro se,* filed a Notice of Appeal.

On June 20, 1995, the Appellate Division issued its unpublished opinion. The court affirmed defendant's convictions but ordered that the possessory offenses set forth in counts 2–5 of the indictment should merge with count one, maintaining a production facility offense. *State v. Kittrell,* No. A–4711–92T4 *slip. op.* at 15–16 (App.Div. June 20, 1995). The Appellate Division did, however, find that defendant's sentence was excessive, noting that the sentence far exceeded the State's recommendation and "was the equivalent of a sentence for murder." *Id.* at 15. Accordingly, the Appellate Division remanded for resentencing on the production facility charge, the merger of the possession and possession with intent charges, and a determination of the amount of gap time

credit that defendant was entitled to receive. We granted defendant's petition for certification. 142 *N.J.* 573, 667 *A.*2d 190 (1995).

## II

Defendant raises several issues on appeal. First, defendant asserts that the legislative commentary to *N.J.S.A.* 2C:35–4 evinces the Legislature's intent that the statute is meant only to cover commercial manufacturing laboratories or "crack houses", facilities that manufacture drugs on a substantial and ongoing basis. Thus, defendant argues that a reasonable construction of the facility statute would exclude his alleged behavior. Second, defendant contends that *N.J.S.A.* 2C:35–4, as applied to him is unconstitutionally vague as there is nothing to distinguish conviction under *N.J.S.A.* 2C:35–4 for a first-degree crime, from conviction under *N.J.S.A.* 2C:35–5, for the manufacturing, dispensing or distributing drugs, a third-degree crime. Third, defendant asserts that the evidence was insufficient to support his conviction under *N.J.S.A.* 2C:35–4. Finally, defendant argues that the trial court's charge on reasonable doubt, although not objected to at trial, "served to lessen the State's burden of proof" because the charge contained references to "moral certainty."

We address each of defendant's arguments.

## A

In 1987, in an effort to revise and strengthen the criminal drug statutes under Title 2C, the Legislature adopted the "Comprehensive Drug Reform Act." *N.J.S.A.* 2C:35–1 to –23. Under *N.J.S.A.* 2C:35–1.1, the "Declaration of policy and legislative findings" provision, the Legislature observed: "despite the impressive efforts and gains of our law enforcement agencies, the unlawful use, manufacture and distribution of controlled dangerous substances continues to pose a serious and pervasive threat to the health, safety and welfare of the citizens of this State." The statute further observed that "the battle against drug abuse and drug related crime must be waged aggressively at every level along the drug distribution chain." *N.J.S.A.* 2C:35–1.1c.

*N.J.S.A.* 2C:35–4, "Maintaining or operating a controlled dangerous substance production facility" was enacted as part of the Comprehensive Drug Reform Act. *N.J.S.A.* 2C:35–4 states:

> [A]ny person who knowingly maintains or operates any premises, place or facility used for the manufacture of methamphetamine, lyseric acid diethylamide, phencyclidine or any substance classified as a narcotic ... or any person who knowingly aids, promotes, finances or otherwise participates in the maintenance or operations of such premises, place or facility, is guilty of a crime of the first degree....
>
> [*N.J.S.A.* 2C:35–4].

The definition section of the statute defines "manufacture" to mean:

> [T]he production, preparation, propagation compounding, conversion, or processing of a controlled dangerous substance or controlled dangerous analog, either directly or by extraction from substances of natural origin, independently by means of chemical synthesis, and *includes any packaging or repackaging of the substance or labeling or relabeling of its container,* except that this term does not include the preparation or compounding of a controlled dangerous substance or controlled substance analog by an individual for his own use ...
>
> [*N.J.S.A.* 2C:35–2 (emphasis added).]

 The definitional provision of *N.J.S.A.* 2C:35–2 fails to define "maintain." *Webster's Third New International Dictionary* defines maintain as "to preserve in: carry on: keep up: continue." *Webster's Third New International Dictionary* 1362 (3d ed. 1976). We believe that that meaning reflects the legislative intent. Therefore, for Kittrell to be convicted under *N.J.S.A.* 2C:35–4, he must "maintain" a facility that "manufactures" a controlled dangerous substance. To establish such "maintenance" there must be some evidence of continuity in his use of Brown's apartment to manufacture crack. Such evidence may be as here, that he used the apartment on more than one occasion as a manufacturing facility. We recognize that there may be a few cases where a person will be apprehended the first time that he operates a manufacturing facility. To sustain a conviction under those circumstances, there must be some evidence that the defendant intended to operate the manufacturing facility on more than one occasion.

"As a general rule of statutory construction, we look first to the language of the statute. If the language is clear and unambiguous

on its face and admits only one interpretation, we delve no deeper than the act's literal terms to divine the Legislature's intent." *State v. Butler*, 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982). *N.J.S.A* 2C:35–4 provides that a person is guilty of maintaining a drug production facility, when he "knowingly maintains or operates any premises, place or facility used for the manufacture of . . . any substance classified as a narcotic. . . ." *N.J.S.A.* 2C:35–4. Furthermore, the definition of "manufacture" includes the "preparation . . . or processing of a controlled dangerous substance . . . and includes any packaging or repackaging of the substance or labeling or relabeling of its container." *N.J.S.A.* 2C:35–2.

▪ Based on the plain language of the statute, defendant's conduct falls within the purview of the statute. Defendant was charged with using Albertina Brown's apartment, with her permission, to "cut up" and package cocaine purchased in New York City. After executing a search warrant, the police uncovered twenty-two vials of cocaine, sixteen small yellow plastic bags and fifty small blue bags containing cocaine. Brown admitted to police that the drugs that were found belonged to defendant and that "[H]e buys it in New York and cuts it up in my apartment," indicating that he used her apartment to repackage drugs on more than one occasion. The Appellate Division concluded that "the drugs seized were packaged for distribution and from the evidence presented, including Brown's statement, a reasonable inference can be drawn that defendant maintained Brown's apartment as a packaging or 'repackaging facility.'" *Kittrell, supra*, slip op. at 9 (citing *State v. Miles*, 231 *N.J.Super.* 27, 30, 555 *A.*2d 1 (App.Div. 1989)). Defendant's continued use of Brown's apartment as a facility to cut up, package and repackage crack cocaine constitutes the maintenance of a drug production facility that is prohibited under *N.J.S.A.* 2C:35–4.

B

▪ The legislative history to *N.J.S.A.* 2C:35–4 supports the conclusion that defendant's acts in Brown's apartment violate that

statute. The Comprehensive Drug Reform Act defined a new first-degree crime to combat facilities that have proliferated throughout the State and "have become an important part of the illicit drug trafficking networks operating in New Jersey." Cannel, *New Jersey Criminal Code Annotated, Comment* on *N.J.S.A.* 2C:35–4 (1987). That statute is intended to reach offenders who maintain such facilities and also those who participate in their maintenance. *Id.* The scope of *N.J.S.A.* 2C:35–4 is broad. Nevertheless, it excludes from its reach a single individual who uses a private residence for the preparation of drugs like crack or freebase cocaine:

> a private residence used by its owner for the preparation, compounding or conversion of substances such as "crack" or free base cocaine would not fall within the meaning of a "production facility" as used in this section provided that the substance was "manufactured" by a single person solely for his own use.
>
> [Cannel, *New Jersey Criminal Code Annotated,* Comment on *N.J.S.A.* 2C:35–4 (1987) ].

However,

> *A structure used by persons who produce or refine crack from raw cocaine for commercial distribution to others, however, (so called "crack houses" or "crack kitchens") would indeed constitute a production facility for the purposes of this section, as would a structure used by numerous individual addicts who produce their own crack for example.*
>
> [*Ibid.* (emphasis added).]

 Defendant asserts that this Court should follow the principles of judicial construction expressed in *State v. Alexander,* 136 *N.J.* 563, 643 *A.*2d 996 (1994), and narrow the scope of *N.J.S.A.* 2C:35–4 to apply only to laboratories or crack houses that manufacture narcotics on a substantial and ongoing basis. In *Alexander,* the defendant was indicted on various drug charges, including *N.J.S.A.* 2C:35–3, being a leader of a drug trafficking-network. The Court in *Alexander* concluded that "the words of the statute alone under *N.J.S.A.* 2C:35–3 ... would not fully convey to the jury the nature of the actual elements of the conduct that the legislature intended to criminalize." *Id.* at 571, 643 *A.*2d 996. The court observed that *N.J.S.A.* 2C:35–3 failed to include "important factors used in the statute's statement of purpose to describe the drug kingpin crime, and, to that extent, does not completely

convey the full legislative understanding in creating this crime." *Id.* at 570, 643 *A.*2d 996. Specifically, the court noted that the statement of purpose expressly makes "defendant's upper-level role in a drug network central to the activity criminalized by the legislature." *Ibid.* The court added that "the prominence of the upper-level status of the defendant in the description and explanation of the purpose of the crime" indicates the legislature's intent that the level or role of the defendant in the drug trafficking network is a "substantive part of the crime." *Ibid.* Therefore, the Court concluded that the status of the defendant is a material element of the crime and should be conveyed in a jury instruction. *Ibid.*

This case can be easily distinguished from *Alexander.* First, in *Alexander, supra,* the legislative intent that the Court relied on was itself expressed in a statute. *N.J.S.A.* 2C:35-1.1 specifically stated in part that "the express purpose of this section is to target for enhanced punishment the upper-echelon member, so-called kingpins, of an organized drug distribution scheme." Cannel, *supra, Criminal Code Annotated, Comment* to *N.J.S.A.* 2C:35-4 at 612. Here, defendant relies not on a statute but legislative commentary. A commentary cannot overcome the plain language of the statute. *State v. Miles,* 231 *N.J.Super.* 27, 29, 555 *A.*2d 1 (App.Div.1989).

Furthermore, unlike *N.J.S.A.* 2C:35-3, *N.J.S.A.* 2C:35-4 contains all the material elements of the crime in the language of the statute itself. Therefore, the legislative intent is clear. Under *N.J.S.A.* 2C:35-4, a person is guilty of maintaining or operating a controlled dangerous substance production facility when any person "knowingly maintains or operates any premises, place or facility used for the manufacture ... of any substance classified as a narcotic drug." *N.J.S.A.* 2C:35-4. Again, unlike *N.J.S.A* 2C:35-3, which does not define who a "leader" in the drug network is, *N.J.S.A.* 2C:35-2 specifically defines "manufacture." *N.J.S.A.* 2C:35-2. The definition of "manufacture" includes "packaging and repackaging." *Ibid.* The language of the statute identifies all the

material elements necessary to convey the legislature's intent. It states that "any premises" used to "manufacture" controlled dangerous substances, which includes "packaging and repackaging", constitutes a CDS production facility. *See N.J.S.A.* 2C:35–2, 2C:35–4.

We reject defendant's assertion that the intention of *N.J.S.A.* 2C:35–4 is to subject only individuals who operate "commercial" manufacturing facilities to the first-degree crime of maintaining a production facility. Indeed, the Legislature's intention to criminalize the production of controlled dangerous substances for distribution, in *any* premises, is reflected in the commentary accompanying the statute. Defendant argues that the commentary's repeated references to "commercial" manufacturing and laboratories suggests that a CDS production facility, under *N.J.S.A.* 2C:35–4, is one that produces controlled dangerous substances over a period of time utilizing highly technical laboratories and sophisticated equipment. However, the statute itself defines "manufacture" to include "any packaging or repackaging of the substance or labeling or relabeling of the container." Moreover, the Commentary clearly expresses the Legislature's intention that private residences used to produce crack are within the purview of the statute. *N.J.S.A.* 2C:35–4. "[A] structure used by persons who produce or refine crack from raw cocaine for commercial distribution to others however, (so-called 'crack houses,' or *'crack kitchens'*) would indeed constitute a production facility for purposes of this section." Cannel, *New Jersey Criminal Code Annotated, Comment* on *N.J.S.A.* 2C:35–4 (1987) (emphasis added).

Defendant was using Albertina Brown's apartment to cut up and repackage crack cocaine for commercial distribution. Such conduct is within the scope of *N.J.S.A.* 2C:35–4. *Alexander, supra,* is inapposite, and judicial construction need not disturb the plain meaning of *N.J.S.A.* 2C:35–4. That statute operates to criminalize the production, for distribution, of controlled dangerous substances in *any* premises, including "crack kitchens."

## C

Defendant also attacks his conviction under *N.J.S.A.* 2C:35–4, "Maintaining or operating a drug production facility," because he contends that that statute is unconstitutionally vague as applied to him. Defendant's challenge is based on the fact that the alleged conduct in the case would support a conviction, not only under *N.J.S.A.* 2C:35–4, the "production facilities" statute, but also under *N.J.S.A.* 2C:35–5, the "manufacturing and distribution" statute, a third-degree crime with much less severe penalties.

*N.J.S.A.* 2C:35–5, the manufacturing and distributing statute, reads in pertinent part:

a. Except as authorized by *P.L.*1970, *c* 226 . . . it shall be unlawful for any person knowingly or purposefully:

(1) to manufacture, distribute or dispense, or to possess or have under his control with the intent to manufacture, distribute or dispense, a [CDS]. . . .

[*N.J.S.A.* 2C:35–5]

Defendant asserts that the quality and quantity of the cocaine attributed to the defendant would satisfy the requirements of the distributing statute and that the only basis to distinguish his conduct from that proscribed by the distribution statute and subject him to the penalties of the facilities statute was the fact that defendant allegedly cut crack inside the "facility" that he "maintained" in Brown's apartment. Defendant argues that if such an increase in liability may be based upon factors as ephemeral as [cutting crack inside rather than outside], it represents an open invitation to "arbitrary and discriminatory" enforcement. *State v. Jones,* 198 *N.J.Super.* 553, 563, 487 *A.*2d 1278 (App.Div. 1985). We observe that the Legislature was aware of this issue when it enacted *N.J.S.A.* 2C:35–4. "[I]t is expected that many persons covered under this section could also be prosecuted for the separate offense of manufacturing, distributing, or dispensing a controlled dangerous substance in violation of *N.J.S.A.* 2C:35–5." Cannel, *New Jersey Criminal Code Annotated, Comment* on *N.J.S.A.* 2C:35–4.

■ "[The] constitutional ban on vague laws is intended to invalidate regulatory enactments that fail to provide adequate notice of their scope and sufficient guidance for the application." *State v. Cameron,* 100 *N.J.* 586, 591, 498 *A.*2d 1217 (1985) (citation omitted). The requirement that all statutes be clear and unambiguous "is essentially a due process concept grounded in notions of fair play." *Ibid.* (quoting *State v. Lashinsky,* 81 *N.J.* 1, 17, 404 *A.*2d 1121 (1979)). In evaluating whether a criminal statute is void for vagueness, this Court, adopting the pronouncement of the United States Supreme Court, observed that "[a] defendant should not be obligated to guess whether his conduct is criminal. Nor should the statute provide so little guidance to the police that law enforcement is so uncertain as to become arbitrary." *State v. Lee,* 96 *N.J.* 156, 166, 475 *A.*2d 31 (1984) (citation omitted).

■ Specifically, defendant challenges *N.J.S.A.* 2C:35–4, a criminal statute, as being unconstitutionally vague because his alleged conduct would support a conviction, not only under *N.J.S.A.* 2C:35–4, the "production facilities" statute, but also under *N.J.S.A.* 2C:35–5, the "manufacturing and distribution" statute, a third degree crime with much less severe penalties. A 1979 United States Supreme Court decision addressed this very issue. *United States v. Batchelder,* 442 *U.S.* 114, 99 *S.Ct.* 2198, 60 *L.Ed.*2d 755 (1979), concerned two overlapping provisions of the Omnibus Crime Control and Safe Streets Act of 1968. Both of those provisions prohibited convicted felons from receiving firearms, but each authorized different maximum penalties. *Batchelder, supra,* 442 *U.S.* at 115–116, 99 *S.Ct.* at 2199–2200, 60 *L.Ed.*2d at 759. The issue the Court addressed was "whether a defendant convicted of the offense carrying the greater penalty may be sentenced only under the more lenient provision when his conduct violates both statutes." *Batchelder, supra,* 442 *U.S.* at 116, 99 *S.Ct.* at 2200, 60 *L.Ed.*2d at 759.

Addressing whether the two overlapping statutes, which provide different penalties for the identical conduct, may be void for vagueness, the *Batchelder* court explained "the provisions in issue

here [ ] unambiguously specify the activity proscribed and the penalties available upon conviction." *Batchelder, supra,* 442 *U.S.* at 123, 99 *S.Ct.* at 2204, 60 *L.Ed.*2d at 764. The court further observed:

That this particular conduct may violate both Titles does not detract from the notice afforded by each. Although the statutes create uncertainty as to which crime may be charged and therefore, what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.

[*Ibid.*]

Rejecting the defendant's vagueness challenge, the Supreme Court next addressed the defendant's contention that the penalty scheme implicated due process and equal protection because, under such a scheme, the "prosecutor's selection of which of [the] two penalties to apply would be 'unfettered' . . . and could produce 'unequal justice.'" *Batchelder, supra,* 442 *U.S.* at 124, 99 *S.Ct.* at 2204, 60 *L.Ed.*2d at 765. The Court rejected this argument as "factually and legally unsound" noting that there exists a well "settled rule" that when "an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Batchelder, supra,* 442 *U.S.* at 123–24, 99 *S.Ct.* at 2204, 60 *L.Ed.*2d at 764–65 (citations omitted).

The Court opined:

[T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause.

[*Batchelder, supra,* 442 *U.S.* at 125, 99 *S.Ct.* at 2205, 60 *L.Ed.*2d at 765 (citations omitted)].

Defendant's vagueness argument is essentially the vagueness argument rejected by the Supreme Court in *Batchelder.* The

provisions at issue, like the provisions at issue in *Batchelder*, specify the activity proscribed and the penalties available on conviction. Likewise, that defendant's conduct may violate both the facilities statute and the manufacturing and distributing statute, "does not detract from the notice afforded by each." 442 *U.S.* at 123, 99 *S.Ct.* at 2204. Accordingly, because the criminal statutes in this case clearly define the conduct prohibited and the penalties imposed, the notice requirements of the Due Process Clause are satisfied.

D

In *State v. Reyes*, 50 *N.J.* 454, 458–59, 236 *A.*2d 385 (1967) we stated that the test to be applied by the trial court in determining the sufficiency of the evidence is

whether viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

[*Id.* at 459, 236 *A.*2d 385 (citation omitted) ].

That standard is consistent with that articulated in *Jackson v. Virginia*, 443 *U.S.* 307, 318–19, 99 *S.Ct.* 2781, 2788–89, 61 *L.Ed.*2d 560, 573–74 (1979). In *Jackson*, *supra*, 443 *U.S.* at 318–19, 99 *S.Ct.* at 2788–89, 61 *L.Ed.*2d at 573–74, the Supreme Court explained the appellate standard for reviewing the sufficiency of evidence to support a criminal conviction:

[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Johnson v. Louisiana*, 406 *U.S.* [356] at 362, 92 *S.Ct.* 1620 [1624–25] 32 *L.Ed.*2d 152. This familiar standard gives full pay to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts.

[*Jackson*, *supra*, 443 *U.S.* 307, 319, 99 *S.Ct.* 2781, 2789, 61 *L.Ed.*2d 560, 573].

*See also State v. Martinez*, 97 *N.J.* 567, 572, 483 *A.*2d 117 (1984) (following *Jackson*, *supra*, 443 *U.S.* 307, 318–19, 99 *S.Ct.* 2781, 2788–89, 61 *L.Ed.*2d 560, 573–74, and holding that the "State's right to the benefit of reasonable inferences cannot be used to reduce the State's burden of establishing the essential elements of

the offense charged beyond a reasonable doubt."). Furthermore, this Court has held "a jury may draw an inference from a fact whenever it is more probable than not that the inference is true; the veracity of each inference need not be established beyond a reasonable doubt in order for the jury to draw the inference." *State v. Brown*, 80 *N.J.* 587, 592, 404 *A.2d* 1111 (1979) (citation omitted).

*N.J.S.A.* 2C:35-4 provides that a defendant is guilty of maintaining or operating a CDS production facility when the defendant "knowingly maintains or operates any premises, place or facility used for the manufacture of [CDS]." "Manufacture" is defined in *N.J.S.A.* 2C:35-2 to include "any packaging or repackaging of the substance or labeling or relabeling of its container."

■ The State's evidence, viewed in the light most favorable to the State, could sustain a reasonable inference that Defendant brought crack to Albertina Brown's apartment more than once (as evidenced in Brown's statement to police that "defendant buys cocaine in New York and cuts it up in my apartment"), and that he continued to use Brown's apartment to store the cocaine, cut the crack into smaller pieces, and place the crack in small bags for later distribution. The cocaine found in the eyeglass case had been separated into vials and yellow and blue baggies ready for sale. When defendant was arrested, four blue baggies of cocaine similar to the baggies found in the eyeglass case were discovered underneath the air conditioner. The jury could have reasonably inferred that defendant kept the greater part of the cocaine in Brown's apartment, which he maintained as a drug manufacturing facility, only taking small amounts to sell at a time so that if he were arrested he would be charged only with possessing cocaine. Those facts, combined with all of the reasonable inferences arising from those facts, would clearly fall within the plain language of *N.J.S.A.* 2C:35-4 and are sufficient to sustain a conviction under that statute.

Two cases addressing *N.J.S.A.* 2C:35-4 also support defendant's conviction. In *State v. Miles, supra*, 231 *N.J.Super.* 27, 555 *A.2d*

1, evidence was presented to the grand jury that when the police arrived in response to a domestic violence call, defendant's girlfriend showed the officers various items of suspected CDS and drug paraphernalia including 35 tinfoil packets of cocaine, two plastic bags of cocaine, 7 vials of crack, 26 glassine envelopes bearing the logo "over the top," five plastic bags of marijuana, a scale, cutting agents and cash. *Id.* at 29, 555 *A.*2d 1. The defendant gave a statement to police admitting that he packaged the cocaine and gave it to two people to sell, that he purchased the cocaine in New York in bulk and repackaged it two lines to a foil. *Ibid.*

The Appellate Division reversed the trial court's dismissal of the indictment under the facilities statute. *Id.* at 30, 555 *A.*2d 1. The trial court held that the facilities statute "did not include the mere diluting of a bulk quantity of drugs and the repackaging of those drugs into smaller units." *Ibid.* The Appellate Division explained, however:

> Although such commentaries are helpful in construing ambiguous statutory language, they do not supersede the plain language of a statute. Moreover, the commentary's emphasis on proliferating drug laboratories and their employment of sophisticated technologists and chemists is not inconsistent with the statute's plain language. The statute does include such laboratories within its purview, but that coverage is not inconsistent with the inclusion of repackaging facilities.
>
> [*Ibid.*].

As the Appellate Division in *Miles* noted, the facilities statute includes repackaging facilities, and it therefore upheld the indictment of defendant who used premises as a repackaging facility. In this case, there also is sufficient evidence to support defendant's conviction under *N.J.S.A.* 2C:35–4. Defendant, like Miles, used a premises to cut up and repackage for distribution CDS.

Similarly, in *State v. Saez*, 268 *N.J.Super.* 250, 633 *A.*2d 551 (App.Div.1993), *rev'd on other grounds*, 139 *N.J.* 279, 653 *A.*2d 1130, cert. den. —— *U.S.* ——, 116 *S.Ct.* 273, 133 *L.Ed.*2d 194 (1995), the Appellate Division upheld the defendant's conviction under the production facility statute, finding there was sufficient evidence to support the defendant's conviction. In *Saez*, undercover investigators observed the defendant and other co-defen-

dants in the process of "re-rocking" cocaine in a basement apartment. *Id.* at 257, 633 *A.*2d 551. Re-rocking cocaine involves adding filler and water to the cocaine, thereafter compressing it until it becomes hard or rock-like. *Ibid.* After the substance was formed into a rock-like substance, co-defendants cut the rocks into smaller pieces and placed them into small plastic bags. *Ibid.* A search was conducted of the basement apartment, which produced evidence of narcotic activity: a blue mixing bowl, spoon, pieces of aluminum foil, and a number of small plastic bags inside a larger one. *Id.* at 259, 633 *A.*2d 551.

The defendant claimed that the evidence was insufficient because the State failed to prove the presence of "other types of paraphernalia such as large scales" or "any amounts of money." *Id.* at 265, 633 *A.*2d 551. The Appellate Division noted that the police investigator described the defendant's activities as "re-rocking" of cocaine. *Id.* at 266, 633 *A.*2d 551. Those activities "sufficiently described a processing and repackaging facility." *Ibid.* Upholding the defendant's conviction under *N.J.S.A.* 2C:35-4, the Appellate Division found that "such activity is within the purview of the statute." *Ibid.*

There was sufficient evidence to establish that defendant was using Albertina Brown's apartment to "cut up" and repackage crack cocaine. Such activity constitutes "manufacturing" under *N.J.S.A.* 2C:35-2. The Commentary specifically indicates that individuals who use private residences to prepare drugs for commercial distribution *to others* are eligible for prosecution. Cannel, *New Jersey Criminal Code Annotated, Comment* on *N.J.S.A.* 2C:35-4. Thus, the legislative intent expressed in *N.J.S.A.* 2C:35-2, 2C:35-4 and the Commentary indicate that defendant properly was convicted for maintaining a drug facility under *N.J.S.A.* 2C:35-4.

E

Although defendant failed to object to the trial court's charge, defendant objected in a supplemental brief that the trial court's

charge on reasonable doubt "served to lessen the state's burden of proof" because that charge contained references to "moral certainty." Defendant argues that as a result of the charge, his right to due process of law was violated. A recent United States Supreme Court decision addressed that issue.

*Victor v. Nebraska,* 511 *U.S.* 1, 114 *S.Ct.* 1239, 127 *L.Ed.*2d 583 (1994) involved two consolidated murder cases from California and Nebraska (*Victor v. Nebraska* and *Sandoval v. California* ), where the respective state Supreme Courts had affirmed the defendants convictions and death sentences. *Victor v. Nebraska, supra,* 511 *U.S.* 1, 114 *S.Ct.* 1239, 127 *L.Ed.*2d 583 (1994). The jury in both cases was given a reasonable doubt charge which contained references to moral certainty. *Ibid.* Both defendants appealed to the Supreme Court based on the moral certainty charge. The United States Supreme Court rejected each defendant's claim and affirmed each defendant's conviction and death sentence. *Victor, supra,* 511 *U.S.* at ——, 114 *S.Ct.* at 1251, 127 *L.Ed.*2d at 601.

Defendant Kittrell's charge below was very similar to Sandoval's charge in *Victor.* The United States Supreme Court held that Sandoval's charge was not unconstitutional and as a result he suffered no due process violations.

 The same instructions that the Supreme Court found reinforced the conclusion that the Sandoval charge "correctly pointed the jurors' attention to the facts of the case before them, not ... to the ethics or morality of Sandoval's criminal acts," were present in Kittrell's jury charge. 511 U.S. ——, 114 S.Ct. at 1241. The trial court's charge below, like Sandoval's charge, specifically stated to the jury that to meet the requirements of beyond a reasonable doubt, they had to have "an abiding conviction toward a moral certainty of the truth of the charges," that were lodged against defendant, Kittrell. The trial court thus injected content into the moral certainty term and impressed upon the jury the need to reach the subjective state of near certitude required by the beyond a reasonable doubt standard. The trial court below instructed the jury that, to find guilt beyond a reasonable doubt,

they "would have to have an abiding conviction after evaluating the facts and evidence in the case ... toward a moral certainty of the truth of the charges." The charge further told the jury that they could not find doubt based on "guesswork," "speculation," or "possibil[ity]." Moreover, the charge instructed that "doubt may not arise solely from sympathy [for the defendant]." Those qualifying phrases, like the phrases relied upon by the Supreme Court in *Victor*, ensured that the jury below understood that moral certainty was not to be disassociated from the evidence in the case.

Despite the charge's references to moral certainty, defendant's charge was not unconstitutional. Defendant suffered no due process violations and his conviction is affirmed.

### III

*N.J.S.A.* 2C:35–4, "Maintaining or operating a drug production facility" contains all of the material elements necessary to convey the legislature's intent. The statute itself and the Legislative commentary accompanying the provision, indicate that the Legislature intended to criminalize the production, for distribution of controlled dangerous substances in *any* premises. Furthermore, the definition of "manufacturing," *N.J.S.A.* 2C:35–2 includes the "packaging or repackaging" of CDS. Judicial construction is unnecessary in this case.

Despite overlapping with the distributing statute, the application of *N.J.S.A.* 2C:35–4 to defendant is not unconstitutionally vague. Based on a review of the evidence and applying the facilities statute as written, there is sufficient evidence to convict defendant under *N.J.S.A.* 2C:35–4. Finally, defendant's claim that the reasonable doubt charge was unconstitutional because of the references to "moral certainty" is without merit.

Accordingly, we affirm the judgment of the Appellate Division.

STEIN, J., dissenting.

Under the Comprehensive Drug Reform Act, *L.* 1987, *c.* 106 (codified at *N.J.S.A.* 2C:35–1 to –23) (Drug Reform Act), any

person who repackages drugs for redistribution is subject to prosecution for "manufacturing" a controlled dangerous substance under one of two sections. The first, *N.J.S.A.* 2C:35–5, imposes criminal liability for simple manufacturing. The degree of the offense depends on the amount and type of drug involved. The other section, *N.J.S.A.* 2C:35–4 (the facilities law), establishes the first-degree crime of maintaining or operating a facility used for the manufacture of a controlled dangerous substance.

Defendant was arrested in possession of approximately an eighth of an ounce of cocaine and a fraction of an ounce of marijuana. Repackaging that amount of drugs constitutes third-degree manufacturing under *N.J.S.A.* 2C:35–5a(1), b(3), which would have exposed defendant to a three- to five-year sentence or to an extended term of five to ten years. However, based primarily on a friend's statement that defendant "buys it in New York and cuts it up in my apartment," defendant was indicted under *N.J.S.A.* 2C:35–4 for operating a drug manufacturing facility. On marginal evidence, and pursuant to an instruction that imposed no requirement of continuity to support a conviction for maintenance or operation of a manufacturing facility, the jury convicted defendant of the first-degree offense. Defendant was sentenced to a sixty-year term with thirty years parole ineligibility. The Appellate Division affirmed the conviction, but remanded for re-sentencing, although defendant remains subject to an extended-term sentence of twenty years to life, with a fifty-year presumptive term and parole disqualification for one-third to one-half of the eventual sentence.

This Court affirms the conviction. I would reverse, because in my view the evidence is insufficient to support the conviction and the trial court's failure to instruct the jury on a requirement of continuity in applying the statute constitutes plain error. Moreover, the Court's affirmance of the first-degree conviction on this shaky record will encourage prosecutors to use the facilities law selectively and arbitrarily to target disfavored drug defendants.

# I

On September 14th and 15th, 1991, Hackensack police observed defendant engage in two apparent drug transactions in which he removed material from a ledge under an air conditioner protruding from apartment A–1 in a building known as 69 Railroad Avenue. Police apprehended defendant, and removed four small bags from beneath the air conditioner containing a total of .10 grams of cocaine. The police then executed a search warrant for apartment A–1 and found an eyeglass holder containing vials and bags of cocaine above the bathroom medicine cabinet. The aggregate amount of cocaine recovered from the eyeglass holder and beneath the air conditioner was 3.83 grams, or slightly more than one-eighth of an ounce. One bag of marijuana containing .53 grams (about one-fiftieth of an ounce) also was confiscated.

Defendant was indicted on two counts of possession, *N.J.S.A.* 2C:35–10a(1), and two counts of possession with intent to distribute, *N.J.S.A.* 2C:35–5a(1) and 5b(3). Because less than one-half of an ounce of cocaine was involved, those were third-degree crimes carrying sentences of three to five years. However, defendant was eligible for an extended-term sentence due to prior drug-related convictions. See *N.J.S.A.* 2C:43–6f. The trial court imposed concurrent sentences of eight years with four years parole ineligibility on both counts of possession and both counts of possession with intent to distribute.

Based primarily on a statement given to police by Albertina Brown, the tenant of apartment A–1, that defendant "buys it in New York and cuts it up in my apartment," the Bergen County Prosecutor also sought and obtained an indictment of defendant on one count of "Maintaining or operating a controlled dangerous substance production facility," *N.J.S.A.* 2C:35–4, a first-degree offense. The Prosecutor's office did not seek an indictment for manufacturing a controlled dangerous substance, *N.J.S.A.* 2C:35–5a(1), b(3), a third-degree offense. The Drug Reform Act defines "manufacture" to include "any packaging or repackaging" of a controlled dangerous substance, *N.J.S.A.* 2C:35–2, with the effect

that a defendant who repackages drugs would theoretically be subject to prosecution under either section of the Act.

At trial, Brown repudiated her statement. The trial court's charge to the jury contained no explanation of the terms "maintains" or "operates," and there was no instruction concerning what level of continuity or substantiality in the alleged manufacturing activity must be proved in order to convict. Defendant was originally sentenced to sixty years with a thirty-year parole disqualification, but the Appellate Division struck down the sentence as excessive. The Court affirms the conviction and holds that defendant may be convicted of maintaining or operating a drug production facility if there is evidence that defendant repackaged cocaine for resale on the same premises "on more than one occasion." *Ante* at 122, 678 *A*.2d at 214.

## II

The legislative commentary to the Drug Reform Act clearly describes the kind of activity intended to be criminalized by *N.J.S.A.* 2C:35–4:

This section creates the new first degree crime [of] maintaining or operating a controlled dangerous substance production facility. *Such laboratories have proliferated throughout the State, and have become an important part of the illicit drug trafficking networks operating in New Jersey. These laboratories, moreover, often employ sophisticated technologies and trained chemists.*

This section is designed to reach those offenders who maintain or operate any premises, place or facility which is used for the unlawful manufacture of certain specified controlled substances.... This offense is also designed to reach any person who aids, promotes, finances or otherwise participates in the maintenance or operations of such a *laboratory* ....

*This section makes clear that maintaining or operating physical plants which produce dangerous drugs constitutes an especially serious offense, since such commercial operations have become an indispensable and prolific source for controlled substances* ....

It is expected that many persons covered under this section could also be prosecuted for the separate offense of manufacturing, distributing or dispensing a controlled dangerous substance in violation of *N.J.S.A.* 2C:35–5. *Unlike 2C:35–5, however, the offense defined in this section is designated as a first degree crime without regard to the quantity or purity of the controlled substances involved, provided that the particular substance produced in the illegal laboratory was one*

of those which are specifically identified in this section. This offense will thus ensure that all manufacturers of these drugs are subject to stern punishment, even where the State is unable to physically seize large quantities.

\* \* \* \* \* \* \* \*

It should be noted that this offense incorporates the current definition of "manufacture," see *N.J.S.A.* 2C:35–2, which expressly excludes the "preparation or compounding of a controlled substance by an individual for his own use." Accordingly, a private residence used by its owner for the preparation, compounding or conversion of substances such as "crack" or free base cocaine would not fall within [the] meaning of a "production facility" as used in this section provided that the substance was "manufactured" by a single individual solely for his own use. *A structure used by persons who produce or refine crack from raw cocaine for commercial distribution to others, however, (so-called "crack houses" or "crack kitchens") would indeed constitute a production facility* for the purposes of this section, as would a structure used by numerous individual addicts who produce their own "crack," for example.

[Assembly Judiciary Comm., *Commentary to the Comprehensive Drug Reform Act* 10–12 (1987) (emphases added), *reprinted in* John M. Cannel, *Criminal Code Annotated* 641–42 (1995).]

The commentary demonstrates the Legislature's intent to target manufacturing operations of a substantial and continuous nature. Of course, a private residence could qualify as a manufacturing facility. However, the references to "commercial operations," "physical plants," and "laboratories" forming "an indispensable and prolific source of controlled substances" demonstrate that more than an occasional repackaging was contemplated. The exclusion of persons who prepare drugs for their own use underscores that the facilities law is aimed at operations that regularly produce drugs in commercial quantities.

Comparison with the simple manufacturing offense under *N.J.S.A.* 2C:35–5 also demonstrates that conviction under the facilities law requires some showing of continuity and substantiality in the manufacturing operation. *N.J.S.A.* 2C:35–5 encompasses the crimes of manufacture, distribution, and dispensing of drugs. The seriousness of the offense is carefully graded, ranging from fourth- to first-degree depending on the amount and type of drug that is involved. In contrast, under *N.J.S.A.* 2C:35–4, the amount and type of drugs seized is immaterial. The critical element is the operation or maintenance of a facility. That conduct was singled

out by the Legislature for punishment as a first-degree offense, with a maximum fine of $500,000, well in excess of that provided under 2C:35–5.

Thus, maintaining or operating a drug production facility is a fundamentally different crime than simple manufacturing. Like a handful of other first-degree crimes simultaneously established by the Drug Reform Act, see *N.J.S.A.* 2C:35–3 (criminalizing "drug-kingpin" status) and *N.J.S.A.* 2C:35–9 (creating strict criminal liability for drug-induced death), the facilities law addresses an exceptionally serious category of drug-related conduct. Under the majority's holding, however, the crucial element of "maintaining or operating" a drug manufacturing facility would be satisfied merely by repackaging drugs in the same location more than once.

The Court's holding will subject innumerable drug dealers to prosecution for maintaining or operating a drug production facility if they repackage their product for resale more than one time in the same place. The Legislature undoubtedly was aware that drug dealers conduct business by buying in bulk and reselling in smaller amounts at a profit. Wholesale application of *first-degree* criminal liability to that routine type of criminal activity cannot be reconciled with the text or legislative history of the statute.

The Court's holding allows the State greatly to expand the intended scope of the facilities law. Deference to the prosecutor's discretion in deciding whether to indict defendant for third-degree manufacturing or first-degree operation of a facility implies that the prosecutor can sustain the burden of proving the more serious charge to a properly instructed jury. The jury, however, cannot perform its essential function without adequate instructions. "A court's obligation properly to instruct and to guide a jury includes the duty to clarify statutory language that prescribes the elements of a crime when clarification is essential to ensure that the jury will fully understand and actually find those elements in determining the defendant's guilt." *State v. Alexander*, 136 *N.J.* 563, 571, 643 *A.*2d 996 (1994).

The trial court's instruction on the facilities law essentially tracked the text of the statute. The jury was instructed that to convict defendant under 2C:35–4 they must find: "One, that the defendant maintained or operated or aided, promoted, financed or otherwise participated in the maintenance or operation of a premises, place or facility. Two, that the premises, place or facility was used for the manufacture of, in this instance cocaine, and manufacture ... includes any packaging or repackaging...." The trial court failed to instruct the jury on what constitutes maintenance and operation of a drug manufacturing facility. Because the statute itself does not adequately define "maintenance" or "operation," the trial court had an obligation to instruct the jury on the proofs the State was obligated to introduce to establish that defendant's use of a friend's bathroom to repackage drugs was of sufficient regularity and magnitude to constitute maintenance and operation of a drug manufacturing facility. Federal courts have construed the corresponding federal statute, which makes it unlawful to "open or maintain" a place for drug manufacturing, to require "continuity in pursuing the manufacture ... of controlled substances," and not to cover an isolated use of a facility for that purpose. *United States v. Clavis*, 956 *F*.2d 1079, 1090, 1094 (11th Cir.1992) (construing 21 *U.S.C.* § 856(a)(1)), *cert. denied*, 504 *U.S.* 990, 112 *S.Ct.* 2979, 119 *L.Ed.*2d 597, *modified on other grounds*, 977 *F*.2d 538 (11th Cir.1992), *cert. denied*, 507 *U.S.* 998, 113 *S.Ct.* 1619, 123 *L.Ed.*2d 178 (1993); *accord United States v. Verners*, 53 *F*.3d 291, 296 (10th Cir.1995); *see also Dawson v. State*, 894 *P*.2d 672, 676 (Alaska.Ct.App.1995) (finding consensus among state courts construing statutes similar to federal statute to include element of continuity).

The trial court's recitation of the statutory language is no substitute for an explanation by the trial court of what the statute is intended to proscribe. *Alexander, supra*, 136 *N.J.* at 571–72, 643 *A*.2d 996. "When 'an instruction solely in the terms of the language of the statute will not give sufficient guidance to the jury,' we have required the definition and construction of pertinent terms for the jury." *State v. Afanador*, 134 *N.J.* 162, 183, 631

A.2d 946 (1993) (O'Hern, J., dissenting) (quoting *State v. Olivio*, 123 *N.J.* 550, 567, 589 *A.2d* 597 (1991)); *see also Alexander, supra*, 136 *N.J.* at 571–72, 643 *A.2d* 996 ("Courts commonly clarify statutory language ... to make sure that juries carry out th[e] [legislative] intent in determining criminal culpability."). Proper and adequate jury instructions are "[a]t the heart of the guarantee of a fair trial." *State v. Collier*, 90 *N.J.* 117, 122, 447 *A.2d* 168 (1982).

Under the instructions the jury received, it could have understood that a single act of repackaging 3.83 grams of cocaine in Brown's bathroom constituted the maintenance or operation of a drug manufacturing facility. " 'The criminal law cannot be administered justly or efficiently if the jury is allowed to speculate as to what conduct the law intended to proscribe by a specified crime.' " *Alexander, supra*, 136 *N.J.* at 572, 643 *A.2d* 996 (quoting *State v. Butler*, 27 *N.J.* 560, 595, 143 *A.2d* 530 (1958)). A single act of repackaging that amount of drugs fits squarely within the definition of third-degree manufacturing and could not reasonably have been contemplated by the Legislature to constitute maintenance of a drug manufacturing facility. The trial court's failure adequately to inform the jury of the essential elements of the State's burden of proving "maintenance" and "operation" left the jury unguided and free to misapply the statute to the meager proofs presented. Under those circumstances, the jury charge constitutes plain error and reversal of the facilities-law conviction is mandated. *See Collier, supra*, 90 *N.J.* at 122–23, 447 *A.2d* 168 (holding that erroneous charge on material issue is presumed to be reversible error); *Butler, supra*, 27 *N.J.* at 595–97, 143 *A.2d* 530 (finding plain error when jury charge inadequately informed jury regarding elements of offense).

The evidence before the jury was clearly insufficient to support a conviction for maintaining or operating a drug manufacturing facility. It consisted solely of the out-of-court statement by Albertina Brown, repudiated at trial, that defendant "buys it in New York and cuts it up in my apartment." There was no

evidence adduced on the frequency with which defendant had used the apartment for repackaging cocaine. Besides Brown's statement, there was no evidence at all of continuity or ongoing use of the apartment for repackaging. A proper instruction would have explained to the jury the Legislature's intent to target commercial manufacturing facilities that contribute to the flow of drugs on a substantial and continuous basis. Such an instruction probably would have led to acquittal.

That the State will begin routinely prosecuting low-level drug dealers for first-degree operation of a drug production facility is unlikely. The danger posed by this decision is the possibility of arbitrary and selective prosecution. The Court's opinion endorses the application of the first-degree statute to a defendant who repackaged drugs on an undetermined number of occasions and happened to attract the unfavorable attention of the Prosecutor. Had defendant been prosecuted for third-degree manufacturing, the offense that more accurately characterizes his conduct, his extended-term exposure would have been five to ten years. On remand, defendant remains subject to a presumptive extended term of fifty years with as much as twenty-five years parole ineligibility. Other occasional repackagers subject to extended sentencing could receive life sentences. The Legislature clearly did not intend such draconian results when it authorized the imposition of special penalties for operating commercial drug manufacturing facilities.

The unmistakable inference from this record is that the Prosecutor has misapplied the statute. The Legislature was attempting to criminalize the operation of major manufacturing facilities. The State has applied the statute to a small-time drug dealer who used his friend's bathroom to divide up drugs for resale. The Court should not tolerate so obvious a distortion of the Legislature's purpose. I would reverse the conviction for maintaining or operating a controlled dangerous substance manufacturing facility under *N.J.S.A.* 2C:35-4.

HANDLER, J., joins in this dissent.

144

*For affirmance*—Justices GARIBALDI, POLLOCK, O'HERN and COLEMAN—4.

*For reversal*—Justices HANDLER and STEIN—2.