**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3722-17T4
                  A-4018-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

NEIT N. FIGUEREO-RODRIGUEZ,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JEAN C. GONZALEZ-ROSARIO,

     Defendant-Appellant.

_____

Submitted June 30, 2020 – Decided September 2, 2020

Before Judges Messano and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 15-05-0613.

Joseph E. Krakora, Public Defender, attorney for appellant Neit N. Figuereo-Rodriguez (Lisette L. Guzman, Designated Counsel, on briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Jean C. Gonzalez-Rosario (Jaime B. Herrera, Assistant Deputy Public Defender, of counsel and on the brief).

Christopher Kuberiet, Acting Middlesex County Prosecutor, attorney for respondent (David M. Liston, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

PER CURIAM

In these appeals, which we calendared back-to-back and now consolidate for the purpose of issuing a single opinion, codefendants Neit N. Figuereo-Rodriguez (Figuereo-Rodriguez) and Jean C. Gonzalez-Rosario (Gonzalez-Rosario) appeal from their respective convictions and sentences for various conspiracy, drug, and financial facilitation offenses. Having reviewed their arguments, the record, and the applicable legal principles, we affirm.

I.

On February 13, 2013, Perth Amboy police arrested defendants after observing a plastic bag of suspected cocaine on the center console of a vehicle

in which Gonzalez-Rosario sat in the driver's seat and Figuereo-Rodriguez sat in the front passenger seat. A subsequent search of Gonzalez-Rosario's residence, a one-room apartment in a house in front of which the vehicle was parked, revealed an additional quantity of cocaine and other drug-related equipment and paraphernalia.

In a nine count indictment, a grand jury jointly charged defendants with the following five offenses based on the evidence seized from the vehicle: second-degree conspiracy to possess a controlled dangerous substance (CDS), cocaine, and to possess cocaine with intent to distribute, N.J.S.A. 2C:5-2, N.J.S.A. 2C:35-10(a)(1), and N.J.S.A. 2C:35-5(a)(1) (count one); third-degree possession of CDS, cocaine, N.J.S.A. 2C:35-10(a)(1) (count two); second-degree possession of CDS, cocaine, with intent to distribute, N.J.S.A. 2C:35-5(b)(3) (count three); possession of CDS, cocaine, with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7 (count four); and third-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(a) (count nine).

Based on the evidence seized from his home, the indictment separately charged Gonzalez-Rosario with four additional offenses: first-degree maintaining a CDS production facility, N.J.S.A. 2C:35-4 (count five); third-

degree possession of CDS, cocaine, N.J.S.A. 2C:35-10(a)(1) (count six); second-degree possession of CDS, cocaine, with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(2) (count seven); possession of CDS, cocaine, with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7 (count eight).

At trial, the State presented Perth Amboy police detective David Guzman and two police officers involved in defendants' arrests, the search of the vehicle, and the search of Gonzalez-Rosario's apartment. The State also presented Gonzalez-Rosario's landlord, who testified about his occupancy of the apartment, and Middlesex County Prosecutor's Office detective Joseph Celentano, who testified as an expert in the areas of manufacturing, packaging, and distribution of cocaine. Defendants did not present any witnesses.

The trial evidence showed that on February 13, 2013, Gonzalez-Rosario had resided for about a month in a one room apartment on Gordon Street in Perth Amboy. On that date, detective Guzman planned to search the apartment and Gonzalez-Rosario's vehicle, and he and other officers were stationed nearby to

monitor the address.[1]  After seeing no sign of Gonzalez-Rosario or his vehicle at the home, detective Guzman drove around the area looking for him.

Detective Guzman saw Gonzalez-Rosario and Figuereo-Rodriguez in a white Mercedes-Benz parked at a Perth Amboy fast-food restaurant.  He saw Figuereo-Rodriguez get out of the car, briefly meet with another male, and get back into the car.  Defendants drove out of the parking lot, but detective Guzman did not follow the vehicle because he feared detection.  Instead, detective Guzman returned to the area of the Gordon Street home, where he waited with the other officers who were stationed nearby.

Approximately one or two hours later, Gonzalez-Rosario and Figuereo-Rodriguez arrived outside the home in the white Mercedes-Benz.  Gonzalez-Rosario exited the front driver's side seat, went into the home for a "couple [of] minutes," and returned to the vehicle's driver's seat.  Detective Guzman and the other officers converged on the vehicle.  As he looked into the driver's side of the vehicle, detective Guzman observed Gonzalez-Rosario and Figuereo-Rodriguez sitting in the front seats and staring at  "a clear plastic baggie

---

[1]  The searches were to be conducted pursuant to search warrants obtained by the Perth Amboy police department.  There was no evidence presented at trial concerning the search warrants.

containing a white powdery substance believed to be cocaine" that sat on the center console between them.

Detective Guzman shined his flashlight in the car and startled defendants who tried to hide the plastic bag. Detective Guzman saw Figuereo-Rodriguez try "to conceal the clear plastic knotted baggie with his left elbow" by moving the bag over and "obscuring the bag from [detective Guzman's] view." When detective Guzman identified himself as a police officer and told Gonzalez-Rosario to unlock the door, Gonzalez-Rosario "grabbed the bag and attempted to stuff it down his pants."

Once defendants were removed from the vehicle, detective Guzman recovered the plastic bag, $900 in cash, a cellphone, and keys to the Gordon Street apartment from Gonzalez-Rosario. During his search of Figuereo-Rodriguez, detective Guzman recovered $3400 in cash. The white powder in the plastic bag was later tested and determined to be more than one-half ounce of cocaine.[2]

A search of the vehicle revealed three additional cell phones. Detective Guzman also found a "baggie with some residue on it," which he testified was "common packaging material for narcotics purposes, for the narcotics trade."

---

[2] The baggie contained 19.71 grams of cocaine.

Detective Guzman used Gonzalez-Rosario's keys to first enter the apartment building and then Gonzalez-Rosario's apartment at the Gordon Street address. The one-room apartment was approximately twelve by ten feet and included a closet. In the closet, detective Guzman found a large, twelve-ton kilo press that appeared to be covered with cocaine residue and had a portable lamp on it. Detective Guzman described the press as "a monstrous device" that was so large it had to be disassembled to be removed from Gonzalez-Rosario's room.

Another officer found a black duffel bag near the closet that contained three bottles of inositol powder—one empty, one nearly empty, and one full and unopened—numerous clear plastic baggies, two two-way radios, a sifter, and numerous "cut Ziploc baggies." A shoe containing $1000 in cash was also found.

Under the bed, officers found a digital scale with a "white powdery residue on it," and a bag containing a "white powdery substance," which laboratory tests established was approximately thirty-four grams of cocaine.

Detective Guzman explained that inositol powder is "a common cutting agent utilized to cut cocaine, specifically." He further explained a "cutting agent" is used in the narcotics trade to increase profits by diluting the drug and

7

increasing the weight of the newly diluted drug.  Detective Guzman testified it is legal to purchase inositol powder, which is generally sold as a nutritional supplement, but the detectives seized it because "it's commonly a tool or resource utilized in the narcotics trade . . . as a cutting agent."  Detective Guzman also explained plastic baggies are commonly "utilized as packaging material," and two-way radios are used to communicate when the CDS distributors do not want their calls intercepted by law enforcement.  Detective Guzman testified a sifter is used "to dilute the product" by "introduc[ing] the cutting agents onto it."  He observed the sifter found had "heavy residue on it."

Detective Guzman further testified about the "kilo press."  He described it as standing, fully assembled, in the closet, and he stated the metal on it "was pretty much covered in a heavy white powdered residue," which he suspected was cocaine but acknowledged was never tested.

The State's expert witness, detective Joseph Celentano, testified cocaine comes "in a hard-pressed brick" and is broken down using a cutting agent such as inositol.  According to detective Celentano a cocaine user usually buys "gram bags" of cocaine, which individually cost between $50 and $70.  The cocaine is packaged in clear or light-colored Ziploc baggies, and a scale is used to weigh the bags before they are sold on the street.  Detective Celentano further testified

8

that other "tools" of the drug trade include untraceable cell phones; two-way radios to avoid wiretaps; and cash in varying denominations, "consistent with whatever they're selling." He also described the use of a kilo press in the packaging and repackaging of cocaine before and after the cocaine has been diluted by a cutting agent.

The jury convicted defendants on all charges in the indictment. Following the merger of offenses, the court sentenced Gonzalez-Rosario to fifteen years with a five-year period of parole ineligibility on the first-degree maintaining and operating a CDS production facility, N.J.S.A. 2C:35-4, offense charged in count five, and a consecutive four-year sentence for his conviction for financial facilitation of criminal activity, N.J.S.A. 2C:21-25(a), under count nine.[3]

The court sentenced Figuereo-Rodriguez to an aggregate ten-year sentence with a three-year period of parole ineligibility. The court imposed a six-year sentence with a three-year period of parole ineligibility for second-

---

[3] The court also merged counts one, two, six, and seven with count three, which charged second-degree possession of CDS with intent to distribute, and it imposed a seven-year term on count three concurrent to the sentence on count five. The court merged count eight with count four, which charged third-degree possession of CDS with intent to distribute within 1000 feet of school property, and it imposed a five-year sentence with a three-year period of parole ineligibility concurrent to the sentences imposed under counts three and five.

degree possession with intent to distribute cocaine, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3), under count three, and a consecutive four-year sentence for third-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(a), under count nine.[4]

Defendants appealed from their convictions and sentences. They present the following arguments for our consideration.

Figuereo-Rodriguez argues:

> POINT I
>
> THE DENIAL OF [FIGUEREO-RODRIGUEZ'S] REQUEST FOR A "MERE PRESENCE" JURY CHARGE WAS REVERSIBLE ERROR THAT DENIED [HIM] A FAIR TRIAL[.]
>
> POINT II
>
> THE TRIAL JUDGE ERRED IN DENYING THE MOTION FOR A JUDGMENT OF ACQUITTAL AS TO ALL THE COUNTS BECAUSE THE STATE FAILED TO ESTABLISH [FIGUEREO-RODRIGUEZ'S] GUILT BEYOND A REASONABLE DOUBT[.]
>
> A. THE TRIAL COURT ERRED WHEN IT DENIED JUDGMENT OF ACQUITTAL AS TO COUNT ONE

---

[4] The court also imposed a concurrent five-year custodial term and three-year period of parole ineligibility on Figuereo-Rodriguez's conviction for third-degree possession of cocaine with intent to distribute within 1000 feet of school property under count four. The court merged Figuereo-Rodriguez's other convictions with those for which he was sentenced.

OF THE CONSPIRACY BECAUSE THE STATE FAILED TO PROVE THE AGREEMENT ELEMENT OF CONSPIRACY BEYOND A REASONABLE DOUBT[.]

B. THE TRIAL COURT ERRED WHEN IT DENIED JUDGMENT OF ACQUITTAL AS TO THE POSSESSION COUNTS AS THERE WAS INSUFFICIENT EVIDENCE TO WARRANT A CONVICTION[.]

C. [THE] COURT ERRED WHEN IT DENIED JUDGMENT OF ACQUITTAL AS TO COUNT NINE – FINANCIAL FACILITATION OF CRIMINAL ACTIVITY BECAUSE THERE WAS NO ACTUAL EVIDENCE OF THE PROPERTY AND THE STATE DID NOT SUBMIT ANY EVIDENCE OR TESTIMONY THAT THE PROPERTY WAS DERIVED FROM CRIMINAL ACTIVITY[.]

POINT III

THE SENTENCE IS EXCESSIVE AND SHOULD BE REDUCED BECAUSE THE JUDGE DID NOT PROPERLY APPLY AND WEIGH THE AGGRAVATING AND MITIGATING FACTORS[.]

Gonzalez-Rosario argues:

POINT I

THE TRIAL COURT'S FAILURE TO PROPERLY CHARGE THE JURY UNDER N.J.S.A. 2C:35-4 WAS PLAIN ERROR AND DEPRIVED [GONZALEZ-ROSARIO] OF A FAIR TRIAL.

11

POINT II

BECAUSE GONZALEZ-ROSARIO IS A FIRST-
TIME OFFENDER, AND BECAUSE HE WAS NOT
AN UPPER-ECHELON DRUG DEALER, HIS
AGGREGATE SENTENCE OF NINETEEN YEARS
IS EXCESSIVE, UNDULY PUNITIVE, AND MUST
BE REDUCED.

We first address defendants' claims of alleged trial errors, and then their excessive sentence arguments.

II.

A.

Figuereo-Rodriguez claims the court deprived him of a fair trial by denying his request to include a "mere presence" charge in the final jury instructions. He argues the charge was required to inform the jury that his mere presence in the vehicle where the baggie containing more than a half-ounce of cocaine was found could not support a conviction for any of the possessory CDS offenses. The court rejected the request because it found the model criminal jury charge defining possession did not include a mere presence charge, and defense counsel did not provide the court with a proposed mere presence charge.

Clear and correct jury instructions are fundamental to a fair trial, and erroneous instructions in a criminal case are "poor candidates for rehabilitation under the plain error theory." State v. Jordan, 147 N.J. 409, 422 (1997) (citations

12

and internal quotations omitted).  Proper jury instructions are essential to a fair trial.  A court must provide "a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find."  State v. Green, 86 N.J. 281, 287-88 (1981).

A trial court's "[f]ailure to honor proper [jury charge] requests will ordinarily be deemed prejudicial error when the subject matter is fundamental and essential or is substantially material to the trial."  Id. at 291.  However, in determining whether an alleged defect in a charge rises to the level of reversible error, the alleged error must be "viewed in the totality of the entire charge, not in isolation."  State v. Chapland, 187 N.J. 275, 289 (2006); see also State v. Figueroa, 190 N.J. 219, 246 (2007).

The court correctly determined that at the time of trial, the model jury instruction on possession did not include a mere presence charge.[5]  See Model Jury Charges (Criminal), "Possession" (N.J.S.A. 2C:2-1) (June 2014); see also State v. Randolph, 228 N.J. 566, 591 (2017) (explaining the June 2014 model jury charge on constructive possession did not include a mere presence charge).  "When a jury instruction follows the model jury charge, although not

_____

[5]  The model jury charge on possession was amended in June 2018, subsequent to defendants' trial, to include a mere presence instruction.  Model Jury Charges (Criminal), "Possession" (N.J.S.A. 2C:2-1) (rev. June 11, 2018).

determinative, 'it is a persuasive argument in favor of the charge as delivered.'" State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000)); see also State v. R.B., 183 N.J. 308, 325 (2005) ("[I]nsofar as consistent with and modified to meet the facts adduced at trial, model jury charges should be followed and read in their entirety to the jury.").

Defendant relies on Randolph, where the Court found that although the mere presence instruction was not included in the model jury charge on possession, "[n]o constraint barred the trial court from giving the" instruction and "the better course would have been to give the [instruction] to disabuse the jury of any possible notion that a conviction could be based solely on defendant's [mere] presence." 228 N.J. at 592. The same conclusion is required here. Defendants' trial followed the Court's decision in Randolph, and the trial court's refusal to give the requested mere presence instruction simply because it was not included in the model jury charge was in error.[6]

---

[6] In Randolph, the Court remanded for a new hearing on the defendant's suppression motion and explained that if the trial court determined the defendant was entitled to a new trial based on the outcome of the suppression hearing, "the 'mere presence' [instruction] should be included in the instructions read to the jury." Id. at 593.

The error does not, however, require a reversal of Figuereo-Rodriguez's convictions because it was harmless. See R. 2:10-2. As the Court explained in Randolph, it is harmless error to fail to give a mere presence instruction where "[t]he charge, as a whole, sufficiently informed the jury – without using the words 'mere presence' – that defendant's presence . . . standing alone, would be insufficient to establish guilt." Id. at 592.

Here, the court's charge on possession explained that defendants could not be found guilty of the possessory offenses unless they had "conscious, knowing possession, either actual or constructive" of the baggie of cocaine observed on the console of the vehicle and retrieved from Gonzalez-Rosario's pants.[7] The instruction further explained that to find defendants guilty, the State was required to prove beyond a reasonable doubt they "had knowing, intentional control of the cocaine accompanied by knowledge of its character."

When viewed in its entirety, the court's charge on possession did not permit the jury to find Figuereo-Rodriguez guilty based on his mere presence in the vehicle. For that reason, the court's decision not to give the mere presence charge was not "clearly capable of producing an unjust result," id. at 592

---

[7] The jury instruction referred to the baggie of cocaine as Exhibit S-1, which was identified during the testimony as the baggie detective Guzman observed on the vehicle's console and recovered from Gonzalez-Rosario's pants.

(quoting R. 2:10-2); see also State v. Montesano, 298 N.J. Super. 597, 612-15 (App. Div. 1997) (finding jury charges on possession and constructive possession when read in their entirety "left no room for doubt that 'mere presence' was insufficient to bring about a finding of the necessary elements of possession"), and does not require reversal of Figuereo-Rodriguez's convictions.

B.

Figuereo-Rodriguez also claims the court erred by denying his motion for acquittal after the presentation of the State's evidence as to count one, which charged conspiracy to possess cocaine and to possess cocaine with intent to distribute; counts two through four, which charged possessory CDS offenses; and count nine, which charged financial facilitation of criminal activity. Figuereo-Rodriguez argues the court erred by denying his motion because the State failed to present sufficient evidence establishing the elements of the crimes charged.

We review a court's denial of a motion for a judgment of acquittal de novo, "applying the same standard as the trial court." State v. Zembreski, 445 N.J. Super. 412, 430 (App. Div. 2016). Under that standard, we "must determine only whether, 'based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn

from that testimony, a reasonably jury could find guilt beyond a reasonable doubt.'" Ibid. (quoting State v. Williams, 218 N.J. 576, 594 (2014)); see also State v. Reyes, 50 N.J. 454, 459 (1967) (stating this court views "the State's evidence in its entirety, be that evidence direct or circumstantial").

Under Rule 3:18-1, "the trial judge is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004).

Figuereo-Rodriguez argues the court erred by denying his motion for a judgment of acquittal on count one because there was no evidence he conspired with Gonzalez-Rosario to commit any crime. Count one charged defendants with conspiracy to commit the crimes of possession of cocaine or possession of cocaine with intent to distribute. The cocaine at issue is that which was found in the baggie containing more than a half-ounce of cocaine first observed in the vehicle and then recovered from Gonzalez-Rosario's pants.

A person is guilty of conspiracy with another person to commit a crime if with the purpose of promoting or facilitating its commission he or she:

> (1) [a]grees with such other person . . . that they or one or more of them will engage in conduct which

constitutes such crime or an attempt or solicitation to commit such crime; or (2) [a]grees to aid such other person or persons in the planning or commission of such crime or an attempt or solicitation to commit such crime.

[N.J.S.A. 2C:5-2(a)].

"The essential elements of [a] . . . conspiracy case must be understood with reference to its alleged criminal object." State v. Samuels, 189 N.J. 236, 246 (2007). Here, the State alleged defendants conspired to possess the cocaine in the baggie first seen in the vehicle and to possess the cocaine with intent to distribute. A person commits the crime of possession of cocaine when he or she "knowingly or purposely . . . obtain[s] or . . . possess[es], either actually or constructively" cocaine. N.J.S.A. 2C:35-10(a)(1). A person commits the crime of possession of cocaine with intent to distribute if he or she "knowingly or purposely . . . possess[es] or [has] under his [or her] control with intent to manufacture, distribute or dispense" cocaine. N.J.S.A. 2C:35-5(a)(1).

Accordingly, to prove the conspiracy charged in count one, the State was required to establish that with the purpose of promoting or facilitating the crimes of possession of cocaine or possession of cocaine with intent to distribute, Figuereo-Rodriguez agreed with Gonzalez-Rosario to: engage in conduct constituting either of those crimes or an attempt or solicitation to commit such

18

crime; or aid Gonzalez-Rosario in the planning or commission of such crimes or an attempt or solicitation to commit such crimes.  N.J.S.A. 2C:5-2(a); N.J.S.A. 2C:35-10(a)(1); N.J.S.A. 2C:35-5(a)(1).

The State is not required to present direct evidence to prove the existence of a criminal agreement.  "An implicit or tacit agreement may be inferred from the facts and circumstances."  State v. Kamienski, 254 N.J. Super. 75, 94 (App. Div. 1992).  Indeed, a criminal "conspiracy is rarely capable of proof through direct evidence" and "is most frequently established by . . . circumstantial evidence."  State v. Graziani, 60 N.J. Super. 1, 13 (App. Div. 1959), aff'd o.b., 31 N.J. 538 (1960).

Here, the court correctly denied the motion for acquittal on the conspiracy charge because there was evidence establishing Figuereo-Rodriguez and Gonzalez-Rosario agreed to possess the over one-half ounce of cocaine in the vehicle and to possess it with intent to distribute.  The evidence supports a reasonable inference they each had actual possession of the cocaine, see State v. Brown, 80 N.J. 587, 597 (1979) (explaining actual possession requires "intentional control and dominion, the ability to affect physically and care for the item during a span of time, accompanied by knowledge of its character"), as well as constructive possession of the cocaine, see State v. Morrison, 188 N.J.

2, 14 (2006) ("[A] person has constructive possession of 'an object when, although he lacks "physical or manual control,"' the circumstances permit a reasonable inference that he has knowledge of its presence, and intends and has the capacity to exercise physical control or dominion over it during a span of time.'" (quoting Spivey, 179 N.J. at 237)).  Defendants were found seated side-by-side next to the baggie of cocaine, staring at it, and they each exercised physical control over it when alerted to detective Guzman's presence.  Their hurried efforts to hide it from view bespeak their knowledge of the baggie's illicit contents.

Moreover, the expert's testimony established the quantity of cocaine was inconsistent with personal use.  The evidence further demonstrated Figuereo-Rodriguez and Gonzalez-Rosario were observed in the vehicle earlier in the day and arrived at Gordon Street together in the vehicle, which was found to contain CDS packaging materials indicative of drug trafficking.  Figuereo-Rodriguez and Gonzalez-Rosario were each found in possession of significant amounts of cash in various denominations, and the State's expert explained the role of cash in various denominations in the drug trafficking business.  In addition, Figuereo-Rodriguez was in the company of, and shared possession of the cocaine with, Gonzalez-Rosario, who the evidence showed maintained a CDS production

20

facility. See State in Interest of J.R., 244 N.J. Super. 630, 635 (App. Div. 1990) ("An inference that a drug smuggler carrying a very large quantity of drugs would travel with a knowledgeable companion, and not an 'innocent' passenger or stranger, is not only reasonable, it is likely." (quoting State v. Palacio, 111 N.J. 543, 554 (1988))).

The facts and circumstances established by the evidence support a reasonable inference Figuereo-Rodriguez and Gonzalez-Rosario had an agreement not only to possess the cocaine found in the vehicle but to do so with the intent of distributing it. Viewing the State's evidence in its entirety and drawing all favorable inferences from the facts presented, the court correctly determined the evidence could reasonably support a finding of guilt beyond a reasonable doubt and properly denied the motion for a judgment of acquittal on the conspiracy charged in count one.

Figuereo-Rodriguez also contends the court erred by denying his motion for acquittal on counts two, three, and four, which alleged CDS possessory offenses. He asserts there was insufficient evidence establishing that he actually or constructively possessed the baggie of cocaine. The argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We note only that the court correctly denied the motion because, for the reasons

already detailed, the "entirety of the evidence" and the favorable inferences that may be drawn from the evidence permitted a reasonable jury to find defendant guilty beyond a reasonable doubt of the possessory offenses charged in the indictment. See Zembreski, 445 N.J. Super. at 430.

Figuereo-Rodriguez also asserts the court erred by denying his motion for an acquittal on count nine, which charged financial facilitation of criminal activity under N.J.S.A. 2C:21-25(a). The statute provides that it is a crime to "transport[] or possess[] property known or which a reasonable person would believe to be derived from criminal activity." N.J.S.A. 2C:21-25(a); see also Cannel, N.J. Criminal Code Annotated, cmt. on N.J.S.A. 2C:21-23 (2020) (explaining N.J.S.A. 2C:21-25 "punishes any possession of property known to be derived from criminal activity"). The State argues that the $3400 recovered from Figuereo-Rodriguez was property he transported and possessed, and that the evidence supports a reasonable inference it was derived from criminal activity–drug trafficking. Figuereo-Rodriguez claims the court should have granted his motion for acquittal on count nine because the State failed to present any evidence the $3400 was derived from criminal activity.[8]

_____

[8] In support of his argument, Figuereo-Rodriguez in part relies on the fact that the court initially indicated it was inclined to grant the motion. Because we

22

To be sure, the evidence established Figuereo-Rodriguez transported and possessed property–$3400–because it was recovered directly from him after he arrived in the vehicle at Gordon Street.  See N.J.S.A. 2C:21-24 (defining "property" as "anything of value").  Thus, we must consider whether the entirety of the evidence, giving the State the benefit of all reasonable inferences, permitted a jury to find that Figuereo-Rodriguez knew the $3400 was derived from criminal activity.[9]  See generally Zembreski, 445 N.J. Super. at 430.  Property is derived from criminal activity when it is "directly or indirectly from, maintained by or realized through" criminal activity.  N.J.S.A. 2C:21-24.

conduct a de novo review of the court's denial of the motion for a judgment of acquittal on count nine, the court's initial inclination is irrelevant to our determination.  In addition, the court's initial indication was accompanied by a clearly stated caveat that the court required additional time to consider the record.  Based on its review of the record, the court subsequently denied the motion, finding the State presented sufficient evidence to support the financial facilitation offense charged under N.J.S.A. 2C:21-25(a).

[9]  We do not find that portion of N.J.S.A. 2C:21-25(a), which provides a person commits a crime by transporting or possessing property "which a reasonable person would believe to be derived from criminal activity," is apposite here.  The State does not contend Figuereo-Rodriguez possessed $3400 "which a reasonable person would [have] believe[d] to be derived from criminal activity."  The State instead asserts the evidence supports a reasonable inference Figuereo-Rodriguez actually knew the cash was derived from criminal activity–his participation in drug trafficking.

Viewing, as we must, the evidence in its entirety, we are convinced a reasonable jury could properly conclude that the $3400 was derived either directly or indirectly through criminal activity, and that Figuereo-Rodriguez knew it. The evidence showed Figuereo-Rodriguez was in the company of, and transported by, Gonzalez-Rosario during a significant portion of the day immediately prior to their arrests. The evidence further showed, and the jury determined, Gonzalez-Rosario maintained a CDS production facility, which Gonzalez-Rosario entered prior to his return to the vehicle just before the arrests. In addition, Figuereo-Rodriguez and Gonzalez-Rosario were found in possession of more than a half-ounce of cocaine in the vehicle and CDS packaging material indicative of drug trafficking, and the jury concluded they possessed the cocaine with intent to distribute it. Defendants were also each in possession of large sums of cash in various denominations, which the State's expert testified were consistent with drug-trafficking. Last, N.J.S.A. 2C:21-26 permits an inference Figuereo-Rodriguez had knowledge the cash was derived from criminal activity because the cash was "discovered in the absence of any documentation or other indicia of legitimate origin or right to such property."

In sum, the totality of those circumstances permitted the reasonable inference the $3400 recovered from Figuereo-Rodriguez was derived from

24                                                                                      A-3722-17T4

criminal activity–drug trafficking–and that he knew it. The court did not err by denying the motion for acquittal on count nine.

C.

Gonzalez-Rosario argues his conviction for maintaining a CDS production facility under N.J.S.A. 2C:35-4 must be reversed because the court failed to properly instruct the jury on the meaning of the terms "maintain" and "continuity of use" in a manner consistent with the discussion of those terms in State v. Kittrell, 145 N.J. 112, 122-23 (1996). He contends that, although he did not object to the court's charge on the elements of the offense, the court should have been alerted to the alleged issues with the charge because he moved for a judgment of acquittal based on the claim the State failed to present evidence sufficient to establish he either maintained a CDS production facility or that there was a continuity of use of the alleged facility.[10]

"A claim of deficiency in a jury charge to which no objection is interposed 'will not be considered unless it qualifies as plain error . . . .'" R.B., 183 N.J. 308 at 321-22 (quoting State v. Hock, 54 N.J. 526, 538 (1969)). Plain error is that which is "clearly capable of producing an unjust result." State v. Whitaker,

---

[10] Defendant does not challenge the court's denial of his motion for a judgment of acquittal on the charge of maintaining a CDS production facility in violation of N.J.S.A. 2C:35-4.

25

200 N.J. 444, 465 (2009) (quoting R. 2:10-2). That said, we are mindful that "[a]ppropriate and proper charges to a jury are essential for a fair trial." Green, 86 N.J. at 287 (citing Gabriel v. Auf Der Heide-Aragona, Inc., 14 N.J. Super. 558, 563-64 (App. Div. 1951)). The trial court has an "independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004) (citing State v. Thompson, 59 N.J. 396, 411 (1971)).

In applying the plain error standard to an erroneous jury instruction, we examine the record to determine whether "[l]egal impropriety in the charge prejudicially affect[ed] the substantial rights of the defendant and [was] sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (quoting State v. Adams, 194 N.J. 186, 207 (2008)). The alleged error must be "viewed in the totality of the entire charge, not in isolation," Chapland, 187 N.J. at 289, and the effect of any error must be considered "in light 'of the overall strength of the State's case,'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting Chapland, 187 N.J. at 289). However, a defendant's attorney's failure to object to jury instructions

26

"gives rise to a presumption that he did not view [the charge] as prejudicial to his client's case." State v. McGraw, 129 N.J. 68, 80 (1992).

If, upon reviewing the charge as a whole, the reviewing court finds that prejudicial error did not occur, then the jury's verdict must stand. State v. Coruzzi, 189 N.J. Super. 273, 312 (App. Div. 1983). "Under this standard, a conviction will stand and 'the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached.'" State v. Garrison, 228 N.J. 182, 202 (2017) (quoting State v. R.K., 220 N.J. 444, 456 (2015)). Our Supreme Court has expressed greater reluctance to reverse for plain error where the error alleged is merely an incomplete instruction rather than an affirmative misstatement of the law. See State v. Marrero, 148 N.J. 469, 496 (1997).

Here, Gonzalez-Rosario argued for a judgment of acquittal on count five based on his claim the State failed to present evidence of "continuity of use" or "maintenance" of the alleged CDS facility. However, having made that argument, he did not later object to the jury instruction on the offense. The failure to object to the charge following Gonzalez-Rosario's argument there was insufficient evidence supporting the offense suggests he perceived only evidentiary proofs as insufficient and did not find any error in the court's

instructions on the law.  In any event, his failure to object to the charge permits the presumption Gonzalez-Rosario perceived no prejudice from the charge given by the court.  See State v. Smith, 212 N.J. 365, 407 (2012) (noting defense counsel's failure to make timely objections indicated no perceived prejudice).

Gonzalez-Rosario now argues the instruction was inadequate because it did not properly define "maintain" and "continuity of use."  In its instruction to the jury, the court defined the elements of the offense based on an almost verbatim recitation of the model jury charge.[11]  See Model Jury Charges (Criminal), "Maintaining or Operating a Controlled Dangerous Substance Production Facility (N.J.S.A. 2C:35-4)" (rev. Dec. 11, 2000).  In pertinent part, the court instructed the jury the State was required to prove beyond a reasonable doubt:

> (1) [t]hat [Gonzalez-Rosario] maintained or operated, or aided, promoted, financed or otherwise participated in the maintenance or operation of, a premises, place, or facility.  To maintain means to carry on, to keep up, to continue.  In order for the State to prove that the defendant maintained the premises, place or facility, there must be evidence of continuity in the use of the [Gordon Street apartment] to manufacture [cocaine].
>
> [Ibid.]

---

[11]  Any of the court's minor departures from the language of the model jury instruction for an N.J.S.A. 2C:35-4 offense are not at issue on appeal.

Gonzalez-Rosario argues the instruction provided by the trial court was inadequate because it did not define the terms "maintain" and "continuity of use" in accordance with the definition of those terms in Kittrell. We disagree. In Kittrell, the Court explained the definition of "maintain" is to "carry on: keep up: continue," 145 N.J. 122, and those definitions are expressly included in the model jury charge the court provided to the jury.

Gonzalez-Rosario also argues that Kittrell required that the court instruct the jury the State was required to prove the facility was used more than once to establish maintenance of a CDS production facility. He contends that by failing to define what he characterizes as the ambiguous term "continuity of use," the jury might have incorrectly determined he was guilty based on a finding the facility was only used "continuously – meaning exclusively – for a single purpose, namely a CDS manufacturing facility."

We reject the argument because the State did not allege Gonzalez-Rosario violated N.J.S.A. 2C:35-4 by simply using the facility exclusively for a single purpose. The State alleged and argued the apartment was used continuously and on more than one occasion as a CDS production facility and Gonzalez-Rosario

intended to continue to use the apartment in the future as a CDS production facility.[12]

The State's case rested on the size, weight, and presence of the kilo press; the substantial amount of residue found on the press; the presence of other drug manufacturing and packaging paraphernalia in the apartment; and the empty, partially empty, and full bottles of the cutting agent, inositol powder. The State argued the bottles of cutting agent constituted the past, present, and future use of Gonzalez-Rosario's CDS manufacturing facility because they proved past use, present use, and the intended future use of the facility to cut and repackage cocaine. Thus, both the State's evidence and argument supported only a single claim of maintenance of a CDS production facility–that the apartment was used

---

[12] Gonzalez-Rosario's argument is also founded on a misreading of the Court's decision in Kittrell. As noted, in Kittrell the Court defined the maintenance of a CDS production facility as including the carrying on, keeping up, or continuing of the facility. 145 N.J. at 122. Consistent with the plain meaning of those terms, the Court explained N.J.S.A. 2C:35-4 requires proof of continuity of use of the facility for CDS production. Ibid. The Court did not require proof of use of the facility on separate occasions to establish proof of continuity of use in each case, but instead noted that, under the circumstances presented in that case, continuity of use could be shown by use of the facility "on more than one occasion as a manufacturing facility." Ibid. Thus, use of a facility on separate occasions may establish the continuity of use essential to proving maintenance of the facility under N.J.S.A. 2C:35-4, but such proof is not required. Contrary to Gonzalez-Rosario's claim, proof of an ongoing, uninterrupted, and continuous use of a facility to manufacture CDS also constitutes the commission of a crime under N.J.S.A. 2C:35-4.

A-3722-17T4

on more than one occasion to manufacture CDS. The court's instruction to the jury on the elements of N.J.S.A. 2C:35-4 accurately described the elements of the offense, as supported by the evidence, in plain and unambiguous language consistent with the Court's holding in Kittrell.

In Kittrell, the Court noted "[f]ederal courts have construed the corresponding federal statute, which makes it unlawful to 'open or maintain' a place for drug manufacturing to . . . not cover an isolated use of a facility for that purpose," id. at 141 (citations omitted). The Court also found that under N.J.S.A. 2C:35-4, a "single act of repackaging . . . drugs" does not constitute maintenance of a CDS production facility. Id. at 142. In a footnote to the model jury instruction, it is suggested that where it is alleged "the defendant was apprehended the first time [he or she] operated a manufacturing facility, the jury should be instructed that to convict . . . , there must be evidence . . . the defendant intended to operate the manufacturing facility on more than one occasion." See Model Jury Charges (Criminal), "Maintaining or Operating a Controlled Dangerous Substance Production Facility (N.J.S.A. 2C:35-4)" (rev. Dec. 11, 2000).

Here, the suggested additional instruction was unnecessary because the State did not allege Gonzalez-Rosario was apprehended the first time he

31

operated the facility, and the State alleged and presented evidence he used the facility on multiple occasions and he intended to continue to use the facility to repackage cocaine. Indeed, the indictment charged Gonzalez-Rosario with maintaining a CDS production facility between January 1, 2015, and February 13, 2015, and the jury found beyond a reasonable doubt he maintained the facility between those dates.

We reject Gonzalez-Rosario's claim the instruction is unduly vague because it does not define the term "continuity of use." The term is employed to clarify what is required to "maintain" a CDS production facility under N.J.S.A. 2C:35-4, and, as noted, the instruction provided requires that the State prove a facility is "kept up" or "continued." Proof of a single use of a facility does not satisfy those requirements, and the term "continuity of use" merely emphasizes and reinforces those requirements. We consider the charge in its entirety, and, in our view, it "provided sufficient guidance such that the jury did not need further clarification of . . . commonly used word[s]," State v. Gaikwad, 349 N.J. Super. 62, 76 (App. Div. 2002). The court's instruction was in accord with the Court's decision in Kittrell, and Gonzalez-Rosario otherwise makes no showing the instruction was clearly capable of producing an unjust result. See R. 2:10-2.

Defendants also claim the court erred in its imposition of their respective sentences. Prior to addressing defendants' arguments, we summarize the principles applicable to our review of a court's sentencing determinations.

Our "review of a . . . court's imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). We are bound to uphold the court's sentence unless "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found . . . were not based upon competent and credible evidence . . . ; or (3) 'the application of the guidelines . . . makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

A sentencing court must determine which, if any, aggravating and mitigating factors apply, and weigh the factors found applicable. Id. at 72–73; see also N.J.S.A. 2C:44–1. Once the court has weighed the applicable factors, it "may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010). "At the time sentence is imposed the judge [must] state reasons for imposing such sentence . . . [and] the factual basis supporting a finding of particular aggravating or mitigating factors affecting

sentence . . . ." R. 3:21–4(g).  We must "affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record."  State v. O'Donnell, 117 N.J. 210, 215 (1989) (citing State v. Jarbath, 114 N.J. 394, 400-01 (1989); Roth, 95 N.J. at 364-65).

## A.

Figuereo-Rodriguez argues his aggregate ten-year sentence is excessive and the court erred in its finding and weighing of the aggravating and mitigating factors.  As noted, the court imposed a six-year sentence with a three-year period of parole ineligibility on Figuereo-Rodriguez's conviction for second-degree possession with intent to distribute CDS, and a consecutive four-year sentence on his conviction for third-degree financial facilitation of criminal activity.  Figuereo-Rodriguez does not challenge the court's imposition of consecutive sentences, and the consecutive sentence imposed for his financial facilitation conviction is mandatory.  N.J.S.A. 2C:21-27(c).

Figuereo-Rodriguez's principal claim is the court erred by failing to find mitigating factor seven, that he has "no history of delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offenses."  N.J.S.A. 2C:44-1(b)(7).  His presentence

investigation report shows he had a municipal court conviction, four motor vehicle offense related bench warrants, and federal immigration removal proceedings prior to his commission of the present offenses.[13]   Although Figuereo-Rodriguez had no prior criminal convictions, his record supports the court's determination he had not led a law-abiding life prior to his commission of the present offenses.  See State v. Buckner, 437 N.J. Super. 8, 38 (App. Div. 2014), aff'd on other grounds, 223 N.J. 1 (2015) (rejecting the defendant's claim his prior municipal court convictions, arrests, and a ten-year-old bench warrant did not support a finding of mitigating factor seven).  Thus, the court did not err by rejecting Figuereo-Rodriguez's request that it find mitigating factor seven.

The court's findings of aggravating factors three and nine are amply supported by the record, as is the court's determination the aggravating factors substantially outweigh the non-existent mitigating factors.  Figuereo-Rodriguez does not argue otherwise.  The court's finding and weighing of the aggravating

---

[13]  The court also noted Figuereo-Rodriguez had federal drug charges pending against him at the time of his sentencing.  It is unclear if those charges pertained to crimes or offenses allegedly committed "before the commission of the present offenses," N.J.S.A. 2C:44-1(b)(7), but even if they allegedly occurred after the commission of the present offenses and therefore could not be properly considered in determining application of mitigating factor seven, Figuereo-Rodriguez's other record independently supports the court's decision not to find mitigating factor seven.

and mitigating factors supported imposition of sentences in the upper ranges for the second- and third-degree offenses for which Figuereo-Rodriguez was convicted. See State v. Natale, 184 N.J. 458, 488 (2005) (explaining that "when the aggravating factors preponderate, sentences will tend toward the higher end of the range"). The court, however, imposed a six-year sentence, which is near the bottom of the range for his conviction of the second-degree offense, and a mid-range four-year sentence for his conviction of the third-degree offenses, see N.J.S.A. 2C:43-6(a)(2) and (3) (defining the sentencing ranges for second- and third-degree offenses). We find no abuse of the court's discretion in its imposition of the sentences; the sentences do not shock our judicial conscience; and we otherwise discern no basis to reverse the sentences. See State v. Bolvito, 217 N.J. 221, 228 (2014).

B.

Gonzalez-Rosario received an aggregate nineteen-year sentence, but challenges only the fifteen-year sentence the court imposed for his conviction for first-degree maintaining a CDS production facility. He contends the fifteen-year term is excessive because he is a first-time offender, he was not an "upper echelon drug dealer," and the court's focus in sentencing "should have been on the crime, not on the offender." He also argues the court erred in considering

his arrest and conviction for federal drug-related charges after he was arrested for the present offenses. We are not persuaded.

The evidence supports the court's finding of aggravating factors three, the risk that defendant would commit another offense, N.J.S.A. 2C:44-1(a)(3); and nine, the need to deter the defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). The court also found mitigating factor seven, Gonzalez-Rosario had no history of prior delinquency or criminal activity when he committed the present offenses. See N.J.S.A. 2C:44-1(b)(7). The court further determined the aggravating factors substantially outweighed the mitigating factors.

We reject Gonzalez-Rosario's claim the court should not have considered his arrest and conviction of a federal drug charge subsequent to his arrest on the present offenses in its findings of aggravating factors three and nine.[14] The record shows Gonzalez-Rosario committed a federal CDS-related offense following his arrest on the very serious CDS-related charges for which he was tried and convicted here. Gonzalez-Rosario apparently learned little from his

---

[14] The presentence investigation report reflects that on June 30, 2017, Gonzalez-Rosario was convicted of distribution of CDS in federal court. During the sentencing proceeding on the present charges, defense counsel acknowledged defendant had been charged and convicted in federal court of a drug related offense and, in his brief on appeal, Gonzalez-Rosario admits he pleaded "guilty to a federal charge." The record is otherwise bereft of details concerning the circumstances supporting the arrest and conviction on the federal charge.

A-3722-17T4

arrest and the pendency of the state court charges against him, and his arrest, the pendency of the charges, and the substantial custodial sentence he faced did not dissuade him from committing another CDS related offense. Those facts support the court's determination there is a risk Gonzalez-Rosario will commit another offense and that there is a specific need to deter him, and others, from committing crimes in the future. Indeed, in his merits brief, Gonzalez-Rosario acknowledges the court "was entitled to consider that [his] subsequent offense suggested he might reoffend."

Gonzalez-Rosario also argues his fifteen-year sentence for violating N.J.S.A. 2C:35-4 is excessive because he did not commit "one of the most serious offenses in [the] class" of offenses prohibited under the statute. N.J.S.A. 2C:35-4. He contends the most serious offense prohibited under N.J.S.A. 2C:35-4 is the actual production of CDS, and he asserts that a defendant who "packag[es] and repack[s] . . . illicit substances, as was the case here" should not be punished as severely as a defendant who manufactures CDS.

In Kittrell, the Court explained N.J.S.A. 2C:35-4 "criminalize[s] the production, for distribution, of [CDS] in any premises," and "the definition of 'manufacturing,' N.J.S.A. 2C:35-2, includes the 'packaging or replacing' of CDS." 145 N.J. at 125-26. Defendant relies on Justice Stein's dissenting

opinion in which he opined that the majority's interpretation of N.J.S.A. 2C:35-4 would incorrectly "subject innumerable drug dealers to prosecutions for maintaining and operating a drug production facility if they repackage their products for resale more than one time in the same place." Id. at 140.

Following the Court's decision in Kittrell, the Legislature amended N.J.S.A. 2C:35-2 on ten occasions without deleting "packaging and repackaging" of CDS as a prohibited form of "[m]anufacture" under the statute.[15] Similarly, N.J.S.A. 2C:35-4 has been amended on three occasions without any modification of the prohibited types of "manufacture."[16] In other words, although it has amended the statutes on numerous occasions since Kittrell was decided, the Legislature's "continued use of the same language" and "failure to amend the" language making packaging and repackaging of CDS a form of prohibited manufacture is evidence the Kittrell Court's interpretation of the statutes "is in accordance with the legislative intent. The persuasive effect of such legislative inaction is increased where the statute has been amended after

---

[15] The post-Kittrell amendments to N.J.S.A. 2C:35-2 are as follows: L. 1997, c. 186; L. 1999, c. 90, § 1; L. 1999, c. 186; L. 1999, c. 376, § 1; L. 2005, c. 205, § 1; L. 2011, c. 120; L. 2012, c. 17, § 2; L. 2013, c. 35; L. 2018, c. 139, § 6; L. 2019, c. 238, §10.

[16] The post-Kittrell amendments to N.J.S.A. 2C:35-4 are as follows: L. 1997, c. 44; L. 1997, c. 186, and L. 199, c. 133, § 2.

A-3722-17T4

a judicial construction without any change in the language so interpreted." North Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 441 N.J. Super. 70, 96 (App. Div. 2015) (quoting Lemke v. Bailey, 41 N.J. 295, 301 (1963)), aff'd in part and rev'd in part on other grounds, 229 N.J. 541 (2017).

We are bound by the Court's long-standing interpretation of N.J.S.A. 2C:35-2 and -4 as expressed in Kittrell. See Liberty Mut. Ins. v. Rodriguez, 458 N.J. Super. 515, 521 (App. Div. 2019) ("Because we are an intermediate appellate court, we are bound to follow the law as it has been expressed by . . . our Supreme Court." (quoting Lake Valley Assocs., LLC v. Twp. of Pemberton, 411 N.J. Super. 501, 507 (App. Div. 2010))). That interpretation undermines Gonzalez-Rosario's claim the packaging and repackaging of cocaine he undertook in his apartment is in some fashion a lesser offense than the other forms of manufacture of CDS prohibited under N.J.S.A. 2C:35-2 and -4.

The Legislature did not differentiate among the many forms of CDS manufacture prohibited by the statutes. Instead, it determined each constitutes a first-degree crime, N.J.S.A. 2C:35-4, and that the sentencing range for the first-degree crime defendant committed is between ten and twenty years, N.J.S.A. 2C:43-6(a)(1). The court's imposition of a sentence within that range must be founded on its weighing of the aggravating and mitigating factors. State

v. Case, 220 N.J. 49, 64-65 (2014). Here, as noted, the court's finding and weighing of the aggravating and mitigating factors is supported by the record, and we discern no basis to conclude the imposition of the fifteen-year sentence for defendant's conviction of the first-degree offense violated applicable sentencing principles or resulted in a sentence that shocks the judicial conscience. We therefore discern no basis to reverse the sentence imposed.

To the extent we have not expressly addressed any of defendants' respective arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed as to A-3722-17. Affirmed as to A-4018-17.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

41